VINSANT, Adm'x v. KNOX.

PROBATE COURTS—*Acts during rebellion void.*—The granting of letters of administration by a Court of Probate of this State, acting under authority of the convention of 1861, or while the State was in rebellion, and all acts and proceedings, thereunder, were null and void; and the statute of *non claim* did not commence to run, against the demands of creditors of such estate, until the granting of letters by a lawful court.

CONSTRUCTION OF CONSTITUTION—*Chapters of the Digest.*—Section 2, Article XV of the Constitution, gave no power to the revisers to prepare new laws, or to alter or amend old statutes, any further than was necessary to render them consistent among themselves, and in harmony with the new Constitution.

SAME.—The "Chapters of the Digest" were not such a revision, etc., as was contemplated by the Constitution, and, therefore, derive no force therefrom.

SAME—*What Chapters valid.*—The "Chapters of the Digest" that are valid, derive their validity from having been legally enacted by the General Assembly, as other original statutes, and of such statutes, sections from one to ten inclusive, of the Chapter entitled "Circuit Courts," and Chapters entitled "corporations and organization of municipal corporations," "regulating the assessment and collection of revenue," "robbery," "forgery and counterfeiting," "enticing females to houses of ill fame," "trespass on personal property," "violating the grave," and "profane cursing and swearing," were only so enacted and valid.

APPEAL FROM CRAWFORD CIRCUIT COURT.

*Jesse Turner* and *Wassell & Moore,* for Appellants.

Whether the decision in *Hawkins vs. Filkins,* 24 *Ark.,* 286, or that of *Penn vs. Tollison,* 26 *Ark.,* 515, was the true interpretation of the law is immaterial. But we maintain that the Supreme Court, having by its decision in 1866, recognized and given effect to the action of the judicial department of the State government during the rebellion, their interpretation of the law was authoritative and supreme, giving a rule of action which was binding upon individuals and courts alike, in all cases affected by it, until overruled and another interpretation of the law given.

It is said, that although the claim may be barred under the decision in *Hawkins vs. Filkins,* it is revived and new life im-

parted to it, by the decision of *Penn vs. Tollison.* But this cannot be so. A claim barred by the statute of *non claim,* which is a special Act of Limitation, is barred forever. The courts have been exceedingly strict in enforcing an observance of this statute; so much so, that if an administrator were to allow, and the Probate Court were to allow and class a claim not exhibited until after the expiration of *two years* from the grant of administration, the act of the administrator, and of the court, would be not merely voidable but absolutely *void;* and if the estate of a deceased person were sold under an order of court to pay such barred claim, the sale would be absolutely void. See *Angell on Lim.,* 160 *and* 161, 5*th edition;* 13 *Mass. R.,* 203; 3 *New Hamp. R.,* 491; 13 *Id.* 192; 16 *Id.* 172; 15 *Id.* 6; 15 *Id.* 58; 10 *Ala.,* 17. See also 17 *Ark. R.,* 533; 18 *Ark. R.,* 334. If then the rule, in reference to demands, barred by the statute of *non claim,* is so inflexible in its operation, we submit, with great confidence, that the appellee's claim is not only barred by the statute of *non claim,* but otherwise stale and obsolete from lapse of time, and ought not to be enforced.

The court also erred in assigning the claim to the fourth instead of the fifth class of claims. See new *Digest Chapters* ———, *page* 38.

*H. F. Thomason,* for appellee.

It is maintained on behalf of appellee, that the supposed proceedings of the Crawford Probate Court, in the appointment of an administratrix, etc., in April 1862, was *coram non judice.* See *Constitution* of 1864, and also of 1868. See also the case of *Latham vs. Clark,* 25 *Ark. R.,* 574, and authorities there cited, and which, by implication, overrule the case of *Hawkins vs. Filkins,* relied upon by appellant.

SEARLE, J.—The appellant's intestate, Isaiah Vinsant, deceased, and one Marzahl, the latter as principal and the former as security, on the 20th of June, 1860, made and deliv-

ered their writing obligatory to the appellee, by which, eighteen months after date, they jointly and severally promised to pay her five hundred dollars, etc. On the 9th of March, 1871, the appellée exhibited her account for allowance, founded on said writing obligatory, to the appellant, as administrator of the estate of the said Vinsant. The account was examined and disallowed ; whereupon it was filed in the office of the clerk of the Probate Court of Crawford county. At the April term of said court, 1871, the cause coming on for trial, the appellant filed her special plea in bar of a recovery, stating in substance, that on the 14th of April, 1862, letters of administration were in due form of law granted to her on the estate of Isaiah Vinsant, deceased; that she immediately thereafter entered upon the duties of said administration and continued in the discharge of them, by virtue of said letters, until the December term, 1870, of the Crawford Circuit Court, when, by the ruling of said court, it was decided that said grant of administration was invalid, because of the existence of the rebellion at the time it was granted; that, in consequence of said ruling, she applied for and obtained letters of administration anew on said estate, bearing date the 30th of January, 1871, and that she is still acting as administratrix of said estate. She further averred that, although letters of administration, on said estate, were granted to her by competent authority, on the said 14th day of April, 1862, the appellee wholly failed to exhibit her said demand, properly authenticated, within two years from said grant of administration, and that, in consequence thereof, the said demand was barred by the statute of *non claim*. To this plea, the appellee filed her general demurrer, which was sustained by the court, and the claim was allowed and assigned to the fourth class of claims against said estate.

From this judgment an appeal was taken to the Crawford Circuit Court. At the June term, 1871, of said court, the cause was tried *de novo*, and the judgment of the Probate Court in all things affirmed. To this decision the appellant excepted and appealed to this court.

The first question, presented by the pleadings in this case, is, was the demand of the appellee barred by the statute of *non claim?*

If the grant of administration to the appellant, on the 14th of April, 1862, was authorized by law and conferred power upon the administratrix to administer the estate of Isaiah Vinsant, deceased, the appellee's demand was barred beyond question.   If the grant of such administration was not authorized by law, and conferred no power upon the administratrix to administer said estate, then there was no legal administration upon said estate until the grant of letters on the 30th of January, 1871, and the appellee's claim was filed in time and properly allowed.   Was the grant of administration on the 14th of April, 1862, legal and valid?   The determination of this, determines the question above propounded, as to whether the appellee's claim was barred by the statute of *non claim.*

The case of *Hawkins vs. Filkins,* 24 *Ark.,* 286, decided at the December term, 1866, of this court, assumed, substantially, that the government of the State continued to exist, *de jure,* from the time the State attempted to secede, until suspended by the action of the State Convention of 1864, and that, as a consequence, the action of the State government, during the period, in its several departments, not effecting the integrity of the Union, was authorized by law and of binding force. The court, accordingly, decided that the judgment rendered in that case, by the Circuit Court of Pulaski county, was valid, though it was rendered after the act of secession and pending the rebellion.   But this assumption was totally overruled at the December term 1870, of this court, by the cases of *Penn vs. Tollison* and *Thompson vs. Mankin.*   These latter cases declare, in substance, that *all the* action of the several departments of the so-called State government, under Confederate rule, was absolutely null and void.   How do these decisions effect the question under consideration?

It is contended by appellant's counsel, that, by the decision of *Hawkins vs. Filkins,* the grant of administration in 1862,

by irresistible implication, was valid and conferred upon the appellant authority to administer the estate of her intestate; that consequently the appellee's claim, not having been filed for allowance within two years, after this grant of administration, was barred, and that the decisions of *Penn vs. Tollison* and *Thompson vs. Mankin*, did not revise the claim or prevent the bar. The appellant's counsel is right in this, if the decision of *Hawkins vs. Filkins*, in addition to the disposition of that particular case, also, settled, for the time being, the law in all like cases. We are not prepared however to concede this. The rulings of the court, in that case, were absolutely overruled by the cases of *Penn vs. Tollison* and *Thompson vs. Mankin*. They are virtually pronounced as never having been the law. It would, therefore, be improper for us *now* to regard them as having any validity in the determination of cases coming before the courts for adjudication. The overruling of them was, perhaps, in some respects, not unlike the repealing of an unconstitutional legislative enactment. It certainly would not be contended that any rights could be acquired generally, under and by virtue of an unconstitutional law, that would remain after the repeal of such law.

Likewise, we conceive that it will not be contended that persons, other than parties to that suit, acquired any rights under and by virtue of the decision of the case of *Hawkins vs. Filkins*, which remain and which we are bound to recognize. The parties in the case of *Hawkins vs. Filkins*, and such other cases as may have been determined in accordance with the rulings in that case, are alone concluded by the decisions in those cases. The appellant, therefore, in this case, could acquire no rights under and by virtue of the rulings and assumptions of the court in the case of *Hawkins vs. Filkins*, that would stand after such rulings and assumptions were overruled by the recent decisions. The recent decisions must be regarded as enunciating the law, not only as it stood at the time and since they were made, but as it stood from the time

of the attempted secession of the State in 1861, anything in the case of *Hawkins vs. Filkins* to the contrary notwithstanding. The appellant's letters of administration, therefore, issued in 1862, were not issued according to law, and the appellee's claim, having been filed within two years after the grant of administration in 1871, was properly allowed.

It is further insisted that the court erred in assigning appellee's demand to the fourth instead of the fifth class of claims against the estate of the deceased. The demand was assigned in accordance with *Section 99, Chapter 4, Gould's Digest.* It is contended, by appellant's counsel, that it should have been assigned in accordance with *Section 1, Chapter 4,* entitled, "Allowance of demands against estates," found under the head of "Estates of deceased persons," in the "Chapters of the Digest," passed by the General Assembly, in its session of 1869, which required demands of this character to be assigned to the fifth class of claims. The court below, in making the assignment under *Section 99, Chapter 4, Gould's Digest,* must have regarded it as unrepealed and in force, while, at the same time, it must have regarded *Section 1 of the Chapter,* entitled, "Allowance of demands against estates," in the "Chapters of the Digest," as a nullity; for it is directly repugnant to the former and, if valid, would certainly operate as a repeal of it, in which case the classification should be made in accordance with its provisions. The validity of this section, (Section 1 of "Allowance of demands against estates,") is assailed upon the ground, that it was not enacted, or did not become a law in the manner prescribed by the Constitution, and upon no other ground, we believe. We will therefore direct our inquiries particularly to this question, and while doing so, we are not unconscious of its more than usual importance; for its decision involves not only the case before us, but a multitude of others; not only this section, but the chapter in which it is found, and, indeed, in a great measure, all the chapters of the so-called "Chapters of the Digest."

It was provided in *Section 11, Article XV,* of the Constitu-

tion of the State, that "This Convention shall appoint not more than three persons, learned in the law, whose duty it shall be, to revise and re-arrange the statute laws of this State, both civil and criminal, so as to have but one law on any one subject; and also three other persons, learned in the law, whose duty it shall be, to prepare a Code of Practice for the courts, both civil and criminal, in this State, by abridging and simplifying the rules of practice and laws in relation thereto; all of whom shall, at as early a day as practicable, report the result of their labors to the General Assembly for their adoption or modification," etc. Under this section these persons were appointed, and the so-called "Chapters of the Digest," including the chapter and section specially under consideration, were a product of their labors. The duties and powers defined and conferred upon the revisers, were defined and conferred by the above section alone; and the first question presented is, Are the so-called "Chapters of the Digest" such a revision of the statute laws of the State as is contemplated by said section? The answer can be arrived at definitely and satisfactorily only, by ascertaining the construction that should be placed upon the words and clause, "to revise and re-arrange the statute laws," etc., found in said section, and by ascertaining, also, the character of the "Chapters of the Digest" in relation thereto. The important word in this clause is, "to revise." We do not propose to enter into an extended discussion as to the various shades of meaning that have been given to this word by lawyers. It is sufficient to say that, as a legal term, it has not been uniformly used to mean precisely the same thing. Our purpose, we think, will be sufficiently accomplished, by taking the brief legal definition of the word, as given in Webster's Dictionary. The meaning there given is, "to review, alter, and amend." Now we conceive that there is nothing in this definition that would signify an act of absolute origination. The acts expressed by the word, must relate to something already in existence. And strictly, with such a reference, is the word used in the section

or clause under consideration. For the duty of the revisers shall be, "to revise and re-arrange the statute laws of this State," etc. We certainly cannot force such a construction from this clause, as would make it the duty of the revisers to originate statute laws for the "adoption" of the legislature *in any manner by which it might see fit to assent to them,* or to *prepare* bills for the legislature to enact into statute laws. An assumption of the former, it seems to us, must be upon the ground, that the Constitution created a body other than the legislature, with legislative powers, and this would be absurd. An assumption of the latter renders the words of the clause meaningless; for, preparing new bills, certainly is not altering or amending old statutes. The revisers, then, were simply "to review, alter and amend," and re-arrange such statute laws as were in existence at that time. More clearly does this appear from the further clause in this section, giving both the reason and the object of the revision, namely, "so as to have but one law on any one subject." This, we conceive, is the natural meaning of the clause, and we should warp it to no other. Our opinion, in brief, therefore is, that the clause, taken as a whole, simply means such a modification and amending of the statute laws then in existence, in addition to their re-arrangement, as would render them consistent among themselves, and in harmony with the new Constitution of the State, nothing more, nothing less. And when so modified, amended, and re-arranged, when so made consistent with themselves, and harmonious with the Constitution of the State, they were to be "reported" to the General Assembly, for its "adoption or modification."

Very different from this was the "Act providing for the revision of the laws of the State of Arkansas," approved October 26, 1836. By the 1st section of this Act, it was provided, "that the Governor shall appoint, by and with the advice and consent of the Senate, two competent persons to revise and arrange the statute laws of this State and prepare such a code of civil and criminal laws as, in their opinion,

may be necessary for the government of the State, and the persons so appointed shall make their report at the next session of the General Assembly, whether it be a regular or a called session." Under this section, something more than the revision and arrangement of the statute laws was contemplated. The revisers were *"to prepare* a code of *civil and criminal laws,"* etc., and great latitude was given them in the preparation of their work. In accordance with these provisions, the revisers, not only revised and arranged the statute laws of the State then in force, but they filled up, so to speak, the chasms that existed in the body of the laws, then in force, on account of their crude, imperfect and meager condition, by preparing and throwing in new laws, the whole constituting a complete code of civil and criminal law; and "the statutes," to use the language of the learned editor, Mr. Pike, in his preface to the revised statutes of 1838, "so revised and presented, were referred to appropriate committees, reported to one or the other House, and passed separately, and with such amendments as seemed proper." We have carefully examined the revised statutes of several other States, and find, universally, that when the revisers went beyond the mere arrangement or digestion of the statute laws, that is, when they so altered and amended them as substantially to make them new, or other than what they were before, and not for the purpose of classification or having "but one law on any one subject," or when, in order to complete and perfect the system, they prepared entirely new laws, such altered, amended or new laws received the legislative sanction by being regularly enacted in accordance with the requisites of legislation. In the case at bar, it seems the revisers went beyond what was required of them, strictly speaking, by Section 11, Article XV, of the Constitution. This section provided for the re-arrangement and digestion of the statute laws, and more than that, it provided for the *"re-arrangement* and *revision* of the statute laws, so as to have but one law on any one subject," and not more than that.

Now, were the "chapters" before us, merely a re-arrangement or digest, (using this term in its restrictive sense) of the statute laws, a single legislative Act adopting them in a body, would have been sufficient. So likewise, no doubt, were they even a revision of the statute laws, * * * * "so as to have but one law on any one subject," this would have been sufficient. But as they do not come within either category, this mode of adopting, if it had been pursued, would have been insufficient. For, in the execution of their trust, the revisers, not so much "re-arranged and revised the statute laws of the State, * * * so as to have but one law on any one subject," as they undertook and did prepare entirely a new code of laws, as the most superficial observer will perceive upon a bare inspection of the so called "Chapters of the Digest." In this they did, without express authority, what the revisers of 1836 were expressly authorized to do. Hence, as the statutes of the latter were "passed separately" and regularly, so much the more the statutes of the former *should* have been, though the revisers presumed to act from constitutional authority. By way of more explicit illustration, let us take the section especially under consideration.

This section changes the classification of demands against the estates of deceased persons. Now, were those changes necessary for the re-arrangement of the laws or to render consistent such classification with other statutory provisions, or to make "but one law on any one subject," the revisers, in making them, acted strictly within the scope of their authority; but this certainly will not be contended. Those changes, therefore, were without authority, and effected such an alteration of the chapter, as necessitated its separate and regular passage by the Legislature to validate it. Hundreds of other such instances, in the "chapters," might be given in illustration of the subject; besides, whole chapters were changed *in toto*, as for instance, the chapters entitled "change of venue in criminal cases," "circuit courts," "how suits may be brought against the State," etc., etc. In fact, almost every chapter is

either new *in toto*, or affected by these alterations and amendments, in a manner not contemplated by the section providing for the revision. Our opinion then emphatically is, that the work of the revisers, thus accomplished, in order to be valid as laws, should have been regularly and by titles separately enacted, by the General Assembly, as original statute laws. There was certainly as much necessity for it as in the case of the revised statutes of 1838. It is true that the word "adopted" is used in the section of the constitution, providing for the revision of the statutes, etc., as expressing the manner by which the statutes, as revised, should receive the legislative assent. This is a very indefinite term. It may be taken to mean an assent, otherwise than by a formal passage of the statutes separately as laws, as for instance, by a single legislative enactment, applicable to the whole work of the revisers, however many subjects it might contain, and which, perhaps, would have been sufficient as hinted above, and not obnoxious to that provision of the Constitution, which declares that "no act shall embrace more than one subject, which shall be embraced in its title," (*See section 22, Art. V., Constitution*), had they (the "chapters") been prepared strictly in the manner contemplated by the section providing for the revision. But, since they were not so prepared, but one mode of "adoption" could be applicable to them, namely, the formal passage of each chapter separately, as ordinary bills. And the General Assembly seems to have partly, at least, taken this view, for it made no attempt to adopt the chapters by a single act, applicable to the whole. In further elucidation of these questions, let us briefly glance at the mode by which the Codes of Civil and Criminal Practice of this State received the legislative sanction. The same section that provided for the revision of the statutes, etc, also provided for the preparation of Codes of Practice, etc., as will be seen by an examination of said section. And the word "adopted," as used in the section, applies equally to the Codes as prepared and the statutes as revised. Accordingly,

the Codes having been prepared in the mode contemplated by this section, were each entitled and adopted by the General Assembly by a formal act, applicable to the whole; *See pages 17 and 257, Codes of Practice*; from which it appears that the General Assembly, in its action upon the Code, is in accord with the views above expressed. The following is a brief summary of our conclusions, thus far, from the above reasoning:

*First.* *Section* 11, *Art. XV.*, of the Constitution, gave no power to the revisers to prepare new laws, or to alter and amend the old statutes any further than was necessary to render them consistent among themselves and in harmony with the new Constitution.

*Second.* The "Chapters of the Digest" was not such a revision, etc., as was contemplated by this section, and, therefore, derives no force therefrom.

*Third.* If valid, they must derive their validity from having been legally enacted by the General Assembly, as other original statutes.

From these conclusions we are now prepared to consider the second principal question suggested, namely, were the so-called "Chapters of the Digest" legally enacted?

Chancellor Kent divides municipal law into written and unwritten, or statute and common law; and he defines written or statute law to be the express written will of the Legislature, rendered authoritative by certain prescribed forms and solemnities. 1 *Kent, Com.*, 456. All those rules and solemnities, whether derived from the common law or prescribed by the Constitution, which are of the essentials of law making, must be observed and complied with, and, without such observance and compliance, the will of the Legislature can have no validity as law. Nothing is law simply and solely because the Legislature wills that it should be. They must enact, and express their determination to that effect, in the mode expressly pointed out by the Constitution, which invests them with the power, and under all the forms which that

instrument impliedly recognizes and renders essential. *Coo-ley's Con. Lim.*, 130.

Nevertheless, "whenever," to use the language of Judge Cooley, "the Legislature is acting in the apparent performance of its legal functions, every reasonable presumption is to be made in favor of its action; it will not be presumed, in any case, from the mere silence of their journals, that either House has exceeded its authority or disregarded a Constitutional requirement in the passage of legislative acts, unless when the Constitution has expressly required the journals to show the action taken." *Cooley's Con. Lim.*, 135; *Weller vs. State*, 3 *Ohio*, *N. S.*, 475; *McCulloch vs. State*, 11 *Ind.*, 424; *Supervisors vs. People*, 25 *Ill.*, 181. Keeping in view the above definition of statute laws, and general rules for their passage, we will now direct our inquiries immediately to the question under consideration.

It is required by the Constitution (*Sec.* 21, *Art. V.*) that "Every bill and joint resolution shall be read three times on different days in each House, before the final passage thereof, unless two-thirds of the House, where the same is pending, shall dispense with the rules." Upon careful examination of the journals (required to be kept, of the proceedings of each House, by *section* 16, *Art. V.*, of the Constitution), we find the entries, relating to the readings on the passage of the "chapters" under consideration, very meager. It appears, from these entries that most of the chapters were read a *third* time by title in each House, the rules being dispensed with. Some of the remainder were so read in one House and not in the other, while none passed these readings regularly, or even by title in both Houses, the rules being dispensed with. The "chapter" entitled "Allowance of demands against estates," especially under consideration, was read a third time by title in both Houses, the rules being dispensed with. *See Senate Journal of* 1868-9, *page* 507, *and House Journal of the same date, page* 619. There is no entry of a first and second reading in any manner. That bills, etc., should be read three:

times on different days, or that the rules should be dispensed with by a two-third vote if they are not so read, are requirements that should be observed. But there is no Constitutional provision that their observance should be evidenced by an entry upon the journals. If there were such a provision, the failure of the journals to show the observance of these requirements would doubtless render invalid the legislative acts. But in the absence of such a provision, it must be presumed that these requirements have been complied with, whether evidenced by an entry upon the journals or not so evidenced, the bills having been put upon their final passage and passed. For every reasonable intendment is to be taken in favor of the regularity of such proceedings as are not required to be evidenced by entries upon the journals, when not so entered. However, there is much reason for regarding these requirements as merely directory in their character, and that their observance by the General Assembly is secured by their sense of duty and their official oaths, and not by any supervisory power of the courts; any other conclusion, we are inclined to think, would lead to very absurd and alarming consequences. Indeed, it might be affirmed that it would go very far towards rendering almost every law of the State invalid. We are of opinion, therefore, that those "chapters" that have been placed upon their final passage and passed, are not invalidated by the silence of the journals in relation to the readings.

It is further required by the Constitution, (*Sec.* 21, *Art. V.,*) that "No bill or joint resolution shall become a law, without the concurrence of a majority voting. On the final passage of all bills, the vote shall be taken by *yeas* and *nays*, and entered on the journal." All acts, etc., must receive a majority of the members voting. This is a test absolutely essential of their validity. Without such majority they would be absolutely null and void. And it is of such paramount importance, that the yeas and nays, as taken, must be entered upon the journals. The obvious reason of this is, that the fact of

their having passed by the requisite majority be made a matter of record; and such record is conclusive of the fact. From all of which it will be seen that those requirements are essentials of the utmost importance. They are strictly mandatory and must be complied with. By an examination of the journals in reference to those requirements, as they relate to the "Chapters" under consideration, we find the following facts, to-wit: All the "Chapters," including the one especially under consideration, were placed upon their final passage, either together or separately, and the votes thereupon taken by yeas and nays and entered upon the journals in both houses, with the exception of the chapters upon "arson," "assault," etc., "bribery," etc., "kidnapping," "maiming," "obscenity," "perjury," etc., "principals and accessories," "rape," etc., and "sabbath breaking." As to these latter chapters, there is nothing whatever in the Senate journal, showing that they were ever passed. This certainly would invalidate them.

One other question we deem it proper to notice in this connection, and that relates to the manner in which most of the "Chapters," including the one especially under consideration, were placed upon their final passage and passed in the House, as evidenced by the entries in relation thereto, in the House journal. We find in said journal (page 619) these entries: "The following chapters of the revised and digested statutes were severally read a third time, viz: "Apprentices," "Privilege from arrest," "Attorney General, Prosecuting Attorneys and County Attorneys." * * * * On motion of Mr. Whitson, Ordered, that the several chapters be placed upon their passage. The question being put, Shall the chapters pass? it was decided in the affirmative—yeas, 53, nays, none. And the yeas and nays were entered upon the journal. Another batch of chapters were severally read and passed in the same way, as appears from the journal, page 866. Still another batch of the chapters were severally read and passed in the same way, as appears from the journal, page 985. Still another batch of the chapters were read a third time and passed

in the same way, as appears from the journal, page 713. These several batches included all the "Chapters of the Digest," with the exception of the one, entitled, "Regulating the assessment and collection of the revenue." From all of which it appears that these chapters, excepting the chapters in the last batch mentioned, which were read together, were separately read a third time, but it does not appear that they were separately placed upon their final passage and passed. Indeed it may be contended from the language used in the journal, that the chapters of each batch were passed together, or by one vote. Now there may be a question as to whether this would render them invalid. There is no express provision in the Constitution, that each bill or act should be separately placed upon its final passage, and that the separate vote on each should be entered upon the journals. The words of the Constitution in relation to this matter are: "On the final passage of all bills, the vote shall be taken by yeas and nays, and entered on the journal." Now it will be observed that there is nothing here that would indicate that each bill should be passed separately. Nevertheless, we are constrained to say that each bill should be, for this is a well settled rule of legislation. Yet we are not prepared to say that laws would be void on account of a disregard of it. Nor do we deem it necessary to settle or determine this question, in this case. For we are strongly inclined to the opinion, that, though the entries in the journal would seem to indicate otherwise, the House observed the rule and passed each chapter separately. This, at least, must be the presumption, as the Constitution does not require, expressly, the separate entry of each date upon the journals, in the passage of each bill.

The Constitution further requires that "No act shall embrace more than one subject, which shall be embraced in its title." (*Sec.* 22, *Art. V.*) We do not propose to discuss the import of this requirement, or to consider the construction placed upon it, or similar ones, by the courts of other States. The whole subject is fully and lucidly considered in *Sedgwick*

*on Statutory and Constitutional Law, page* 50; *Cooley's Constitutional Limitations, page* 141, *and Potter's Dwarris, page* 108. We refer the profession to those works and to the authorities there cited. It is sufficient for us to say, that we are in accord with the great body of those authorities, and must regard this requirement with such reasonable restrictions, as have been laid down in those authorities, as imperative. Considering this requirement with reference to the Chapters under consideration, these questions are suggested: 1st, Were the Chapters acts within the meaning of this requirement? The General Assembly regarded and acted upon them as such, and that is sufficient for us. 2d. Were they sufficiently designated by title? From an examination of the journal, we find that each chapter was denominated in the readings of the General Assembly, by words designed to indicate generally the subject matter of the chapter; for example, chapter 4, under the head of "Estates of deceased persons," was denominated by the words, "Allowance of demands against estates." These denominations were called titles by the General Assembly, and read as such in the passage of the chapters. That this was a very informal and imperfect method of entitling laws, we must admit. But that the acts themselves are void on that account, we are by no means prepared to concede. So far, otherwise, we must regard them as a substantial compliance with the constitutional requirement, and therefore as good, if they sufficiently meet the requisite, namely: that they properly indicate the subject matter, respectively, of the chapters.

We are of opinion, from a careful examination, that this compliance is substantially satisfied in the chapter especially under consideration, and indeed in all the chapters.

It is further provided by the Constitution (*Sec.* 27. *Art V*), that " The style of the laws of the State shall be, ' Be it enacted by the General Assembly of the State of Arkansas.' " We find, from an inspection of the enrolled bills in the office of the Secretary of State, that the General Assembly strictly

complied with the above provision, in a manner about which there could be no question, in relation to but three of the chapters ; namely, a part of the one entitled " Circuit Courts," another entitled " Corporations and organization of Municipal Corporations," and the third, entitled " Regulating the Assessment and Collection of Revenue." These have the enacting clause, and have it properly prefixed. Seven of the chapters, entitled " Robbery," " Forgery" and " Counterfeiting," " Enticing Females to Houses of Ill Fame," " Trespass on Personal property," " Violating the Grave," " Obscenity," " Profane Cursing and Swearing," have the enacting clause prefixed before the title of the chapter, on a separate piece of paper of smaller size, but similarly attached with the other pieces of the bills. The question arises here, as to whether the manner, in which the style seems to have been attached to these chapters, should be regarded as proper evidence that the style was actually used by the General Assembly in the passage of these chapters? In answer to this question, it must be observed that the original bills, in their passage through the two houses of the General Assembly, were in the charge and keeping of its sworn officers ; and that when the work of the Legislature was completed upon them, they passed into the keeping of the Secretary of State. Their custody is of so sacred a character, therefore, that it cannot be presumed that they have been altered or in any manner tampered with, unless the contrary should clearly appear.

The attaching of the style to the bills or chapters, on a separate piece of paper, cannot be regarded as necessarily implying that the bills or chapters were tampered with. It must, accordingly, be presumed that the style was properly observed by the General Assembly. We now come to a consideration of the other chapters of the Digest, with reference to the requirement of a style. We find from an examination of the enrolled bills, on file in the office of Secretary of State, that all the other chapters, including the one especially under consideration, and sections eleven, twelve, thirteen and fourteen,

of the chapter entitled " Circuit Courts," which sections were passed separate and at a different time from the other sections of the chapter, seem to have been passed without the enacting clause. Now if the requirement of an enacting clause be imperative, these latter chapters and sections are void. If directory, otherwise. Let us briefly direct our inquiries to the solution of this somewhat difficult question, difficult because of the meagerness of the authorities throwing light upon it. In the making of laws there are certain requirements that relate more especially to the *mode* of making them, as for example, that they should be read three times upon different days, or the rules be dispensed with, etc. As to those requirements, some of them have been regarded by the courts as being directory merely. But a distinction, we think, is to be made between those requirements which relate more especially to the authority by which laws are made. The law-making power is vested in the General Assembly as constitutionally constituted. That the authority to enact laws, alone resides in that body, is a legal truism. Now all requirements, especially those of a constitutional character, relating to the legislative authority, strictly speaking, and designed directly to evidence the legislative will to make a law, must be regarded as absolutely essential and imperative. For example, that a bill to become a law must receive a majority of the votes of the General Assembly, and that this must be evidenced by the entry of the yeas and nays upon the journals of each house, are essentials relating to the authority by which the law is enacted and the requirement of their observance is imperative. Likewise, that the legislative act, when made, should be a written expression of the legislative will, in evidence, not only of the passage, but of the authority of the law-making power, is nearly or quite a self-evident proposition. Likewise, we regard it as necessary that every act, thus expressed, should show on its face the authority by which it was enacted and promulgated, in order that it should clearly appear, upon simple inspection of the written law, that it was

intended by the legislative power which enacted it, that it should take effect as law. These relate to the legislative authority as evidences of the authenticity of the legislative will. These are the features by which courts of justice and the public are to judge of its authenticity and validity. These, then, are essentials of the weightiest importance, and the requirements of their observance, in the enacting and promulgation of laws, are absolutely imperative. Not the least important of these essentials is the style or enacting clause. So the framers of the Constitution must have regarded it, or they would not have so positively required it in the fundamental law of the land. It is this that most directly expresses the legislative will to make the law, while the same is in process of passage through the General Assembly, and that most solemnly indicates the authority from which it derives its sanction, when it has passed and become a rule of action for the people. Accordingly, great importance was attached to the style of these laws in England, from times of great antiquity; See *Potters Dwarris on Statutes and Constitutions*, 99 ; 1 *Coke upon Littleton*, 99. Not less importance has been attached to the style in the United States; See *Constitutions of the United States and of the several States*. So uniformly has the style, in the enactment of laws, been observed, both in England and the United States, that the courts have very seldom had occasion to consider the subject. We have been able to find but two cases where this subject has come under the notice of the courts, namely, *Irwen vs. Buck*, 40 *Miss.*, 292, *and State vs. Delesdunn*, 7 *Texas*, 94. In the former case, the court held, substantially, in relation to a provision similar to our own, that it was directory so far as the *precise words required*, were considered.

But from the tenor of the decision, we infer that it was the opinion of the court that a substantial compliance with the constitutional requirement was imperative, that some expression was necessary to declare the legislative will in the enactment of laws. From the above considerations, we are

constrained to hold that *Section* 27, *Article* V, must be substantially complied with, and consequently any act or law without the enacting clause, is null and void. This would render invalid all the so called "Chapters of the Digest," including the chapter especially under consideration, and the four sections of the chapter entitled "Circuit Courts," above mentioned, with the exception of those to which the enacting clause appears, as above pointed out.

It is further provided by the Constitution (*Sec.* 35, *Art.* V.) that "every bill and concurrent resolution, except of adjournment, passed by the General Assembly, shall be presented to the Governor for approval before it becomes a law. * * * If any bill be not returned by the Governor, within three days (Sunday's excepted) after it has been presented to him, the same shall become a law, in like manner as if he had signed it, unless the General Assembly, by their adjournment, prevents its return, in which case it shall not become a law. The Governor may approve, sign and file in the office of Secretary of State, within three days after the adjournment of the General Assembly, any Act passed during the last three days of the session, and the same shall become a law."

Most of the "Chapters" were presented to the Governor for his approval, and approved in a manner about which there can be no question. The remainder were presented, it seems, in batches, or attached together in continuous transcripts, for his approval. Three of these batches were composed of chapters which passed the General Assembly before the last three days of its session. Whether approved or not would make no difference, as they were not returned to the House, where they originated, with the Governor's objections; *section* 35, *Article* V, *Constitution*. If not invalid on other accounts, they would become law under the Constitution. The fourth batch was composed of two chapters, namely, "obscenity" and "violating the grave." These were passed during the last three days of the session, and the latter alone received the signature of the Governor, in approval, within

three days after the adjournment of the General Assembly. As to the proper approval of the latter there can be no doubt. But there may be a question as to whether or not the other chapter could be regarded as approved. The two chapters are in one continuous manuscript, and it is possible that the Governor, when he signed the one, purposed, by the single signature, the approval of both. This, we think, was no approval of the first. The one to which his name was directly signed was alone approved. · The constitutional requirement is, that "every bill * * * must be presented to the Governor for his approval," etc. This clause, we think, indicates a several approval. That each bill must be separately signed, we can have no doubt. Any other practice would lead to confusion and uncertainty.

The result of the foregoing considerations shows that the following chapters alone were passed by the General Assembly, with those forms and solemnities necessary to make them valid as laws, namely: Sections from one to ten, inclusive, of the chapter entitled "circuit courts," and chapters entitled "corporations and organization of municipal corporations," "regulating the assessment and collection of revenue," "robbery," "forgery and counterfeiting," "enticing females to houses of ill-fame," "trespass on personal property," "violating the grave," and "profane cursing and swearing."

It is hardly necessary to add, in conclusion, that portions of this opinion are dicta, as this is at once apparent. This must occasionally be the case, in undertaking to consider all the questions involving the validity of so large and various a body of laws, as the so called "Chapters of the Digest," in the adjudication of a single case, an undertaking we could not be induced to enter upon, had it not been for the public exigency demanding a determination of the validity of these chapters. Nevertheless, though some of these questions are not directly involved in the determination of the case at bar, we have bestowed the same care, in their investigation and disposition, as though they had been so.

Finding that the Chapter, entitled, "allowance of demands against estates" is void, we are of opinion that the court below did not err in assigning the demand, in this case, to the fourth class of claims in accordance with Chapter IV, Gould's Digest.

Finding no error in the rulings and judgment of the court below, its judgment is affirmed.